# EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

| | |
|---|---|
| KRISTIANA TWEED BURRELL, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF ARIEL GRACE BURRELL, DECEASED, | 2017 JAN 23 P 12: 21<br>BUNCOMBE CO., C.S.C. |
| **Plaintiff,** | **MOTION FOR EXTENSION OF TIME** |
| v. | |
| BAYER CORPORATION, an Indiana Corporation; BAYER HEALTHCARE, LLC, a Delaware Corporation; BAYER ESSURE, INC., (F/K/A CONCEPTUS, INC.) a Delaware corporation; BAYER HEALTHCARE PHARMACEUTICALS, INC., a Delaware corporation; CHRISTOPHER FORD WILLIAMS; DR. STACY D. TRAVIS; and BILTMORE OB-GYN, P.A. | |
| **Defendants.** | |

NOW COMES Defendant, Biltmore Ob-Gyn, PA, shows unto the Court that the time for filing an Answer or other responsive pleading has not expired and move the Court, pursuant to Rule 6(b) of the North Carolina Rules of Civil Procedure, to extend the time therefore for thirty (30) days for the following reasons:

1.      Counsel for this Defendant has had insufficient time to assemble the information necessary to answer or otherwise respond to the Complaint which was served on this Defendant on or about **December 30, 2016;**

2.      This Defendant asserts that this Motion is made in good faith and not for purpose of delay.

WHEREFORE, this Defendant respectfully requests that the Court enter an Order allowing thirty (30) days in addition to the time allowed by law to respond to Plaintiffs' Complaint

This the 20th day of January, 2017.

Scott M. Stevenson / NC Bar # 8996
John D. Kocher/NC Bar #27272
*Attorney for Biltmore Ob-Gyn and Dr. Stacy D. Travis*

OF COUNSEL:
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon Street, Suite 2200
Charlotte NC 28280
704-375-0057

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of Record by depositing a copy of the same in an official depository of the United States mail in a postage-paid envelope addressed to:

John C. Cloninger
Cloninger, Barbour, Searson, Jones & Cash, PLLC
21 Battery Park Avenue, Suite 201
Asheville, NC 28801
*Attorneys for Plaintiff*

This the 20th day of January, 2017.

John D. Kocher

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 05347

| | |
|---|---|
| KRISTIANA TWEED BURRELL, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF ARIEL GRACE BURRELL, DECEASED, <br><br>                            **Plaintiff,** <br><br> v. <br><br> BAYER CORPORATION, an Indiana Corporation; BAYER HEALTHCARE, LLC, a Delaware Corporation; BAYER ESSURE, INC., (F/K/A CONCEPTUS, INC.) a Delaware corporation; BAYER HEALTHCARE PHARMACEUTICALS, INC., a Delaware corporation; CHRISTOPHER FORD WILLIAMS; DR. STACY D. TRAVIS; and BILTMORE OB-GYN, P.A. <br><br>                           **Defendants.** | **ORDER** |

      THIS CAUSE, being heard by the undersigned Clerk upon Motion of this Defendant, Biltmore Ob-Gyn, for an Order extending the time within which to file an Answer or other responsive pleadings pursuant to Rule 6 of the North Carolina Rules of Civil Procedure; and

      IT APPEARING to the Court that the time allowed has not expired and that the Motion should be allowed;

      IT IS, THEREFORE, ORDERED THAT the time to file an Answer or other responsive pleadings to Plaintiffs' Complaint be extended to and including the   **1st**   day of   **March, 2017.**

This the 24th day of   January  , 2017.

                                      _____
CLERK OF SUPERIOR COURT
Buncombe County, NC

# STATE OF NORTH CAROLINA

File No. 16CV 05347

Buncombe _____ County     FILED

In The General Court Of Justice
☐ District   ☒ Superior Court Division

*Name Of Plaintiff*
Kristiana Tweed Burrell, Individually and as Administratrix of 2016 DEC 16 P 3:01
the Estate of Ariel Grace Burrell, Deceased

*Address*
c/o 21 Battery Park Avenue, Suite 201     BUNCOMBE CO. C.S.C.

*City, State, Zip*
Asheville, NC 28801    BY

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3, 4

**VERSUS**

*Name Of Defendant(s)*
Bayer Corporation, an Indiana corporation; Bayer Healthcare LLC, a
Delaware corporation; Bayer Essure®, Inc., (F/K/A CONCEPTUS, INC.) a
Delaware corporation; Bayer Healthcare Pharmaceuticals, Inc., a
Delaware corporation; Christopher Ford Williams; Dr. Stacy D. Travis; and
Biltmore OB-Gyn, P.A.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

### To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Bayer Corporation<br>327 Hillsborough St.<br>Raleigh, NC 26703 | Bayer Healthcare LLC<br>327 Hillsborough St.<br>Raleigh, NC 27603 |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>John C. Cloninger<br>Cloninger, Barbour, Searson, Jones & Cash, PLLC<br>21 Battery Park Avenue, Suite 201<br>Asheville, NC 28801 | *Date Issued*<br>12-16-16 | *Time*<br>3:01 | ☐ AM<br>☒ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☑ *Deputy CSC*   ☐ *Assistant CSC* | | ☐ *Clerk Of Superior Court* |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* | ☐ AM<br>☐ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☐ *Deputy CSC*   ☐ *Assistant CSC* | | ☐ *Clerk Of Superior Court* |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

Case 1:1  -cv-00031-MOC-DCK    Document 1-1    Filed 01/26/17    Page 6 of 51

# STATE OF NORTH CAROLINA

**File No.** 16 CV 05347

Buncombe _____ County

FILED

2016 DEC 16 P 3: 01

BUNCOMBE CO. C.S.C.

BY _____

In The General Court Of Justice
☐ District ☒ Superior Court Division

*Name Of Plaintiff*
Kristiana Tweed Burrell, Individually and as Administratrix of
the Estate of Ariel Grace Burrell, Deceased

*Address*
c/o 21 Battery Park Avenue, Suite 201

*City, State, Zip*
Asheville, NC 28801

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

**VERSUS**

*Name Of Defendant(s)*
Bayer Corporation, an Indiana corporation; Bayer Healthcare LLC, a
Delaware corporation; Bayer Essure®, Inc., (F/K/A CONCEPTUS, INC.) a
Delaware corporation; Bayer Healthcare Pharmaceuticals, Inc., a
Delaware corporation; Christopher Ford Williams; Dr. Stacy D. Travis; and
Biltmore OB-Gyn, P.A.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Bayer Essure®Inc., (F/K/A CONCEPTUS, INC.)<br>100 Bayer Blvd.<br>Whippany, NJ 07981 | |

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>John C. Cloninger<br>Cloninger, Barbour, Searson, Jones & Cash, PLLC<br>21 Battery Park Avenue, Suite 201<br>Asheville, NC 28801 | *Date Issued* 12-16-16 | *Time* 3:01 | ☐ AM ☒ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☒ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* | ☐ AM ☐ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☐ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

File No. **16CV 05347**

Buncombe _____ County

FILED

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Kristiana Tweed Burrell, Individually and as Administratrix of the Estate of Ariel Grace Burrell, Deceased | 2016 DEC 16 P 3: 01 |
| *Address*<br>c/o 21 Battery Park Avenue, Suite 201 | BUNCOMBE CO. C.S.C. |
| *City, State, Zip*<br>Asheville, NC 28801 | BY |

**CIVIL SUMMONS**

☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

**VERSUS**

| | |
|---|---|
| *Name Of Defendant(s)*<br>Bayer Corporation, an Indiana corporation; Bayer Healthcare LLC, a Delaware corporation; Bayer Essure®, Inc., (F/K/A CONCEPTUS, INC.) a Delaware corporation; Bayer Healthcare Pharmaceuticals, Inc., a Delaware corporation; Christopher Ford Williams; Dr. Stacy D. Travis; and Biltmore OB-Gyn, P.A. | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1*<br><br>Bayer Healthcare Pharmaceuticals, Inc.<br>327 Hillsborough St.<br>Raleigh, NC 27603 | *Name And Address Of Defendant 2* |
|---|---|

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>John C. Cloninger<br>Cloninger, Barbour, Searson, Jones & Cash, PLLC<br>21 Battery Park Avenue, Suite 201<br>Asheville, NC 28801 | *Date Issued*<br>12-16-16 | *Time*<br>3:01 | ☐ AM<br>☒ PM |
|---|---|---|---|
| | *Signature*<br>_(signature)_ | | |
| | ☒ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* | ☐ AM<br>☐ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☐ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

File No. **16CV 05347**

Buncombe _____ County

FILED

2016 DEC 16 P 3:01

BUNCOMBE CO., C.S.C.

BY _____

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
Kristiana Tweed Burrell, Individually and as Administratrix of the Estate of Ariel Grace Burrell, Deceased

*Address*
c/o 21 Battery Park Avenue, Suite 201

*City, State, Zip*
Asheville, NC 28801

**VERSUS**

*Name Of Defendant(s)*
Bayer Corporation, an Indiana corporation; Bayer Healthcare LLC, a Delaware corporation; Bayer Essure®, Inc., (F/K/A CONCEPTUS, INC.) a Delaware corporation; Bayer Healthcare Pharmaceuticals, Inc., a Delaware corporation; Christopher Ford Williams; Dr. Stacy D. Travis; and Biltmore OB-Gyn, P.A.

## CIVIL SUMMONS
## ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Christopher Ford Williams<br>22512 Torrence Chapel Rd.<br>Cornelius, NC<br>28031-6795 | |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| John C. Cloninger<br>Cloninger, Barbour, Searson, Jones & Cash, PLLC<br>21 Battery Park Avenue, Suite 201<br>Asheville, NC 28801 | 12-16-16 | 3:01 ☐ AM ☒ PM |

Signature

☒ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

---

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

| Date Of Endorsement | Time |
|---|---|
| | ☐ AM ☐ PM |

Signature

☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

# STATE OF NORTH CAROLINA

File No. **16 CV 05347**

Buncombe _____ County

FILED

In The General Court Of Justice
☐ District ☒ Superior Court Division

2016 DEC 16 P 3: 01

BUNCOMBE CO., C.S.C.

BY _____

| | |
|---|---|
| *Name Of Plaintiff*<br>Kristiana Tweed Burrell, Individually and as Administratrix of the Estate of Ariel Grace Burrell, Deceased<br>*Address*<br>c/o 21 Battery Park Avenue, Suite 201<br>*City, State, Zip*<br>Asheville, NC 28801 | **CIVIL SUMMONS**<br>☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)<br>*G.S. 1A-1, Rules 3, 4* |

**VERSUS**

| | |
|---|---|
| *Name Of Defendant(s)*<br>Bayer Corporation, an Indiana corporation; Bayer Healthcare LLC, a Delaware corporation; Bayer Essure®, Inc., (F/K/A CONCEPTUS, INC.) a Delaware corporation; Bayer Healthcare Pharmaceuticals, Inc., a Delaware corporation; Christopher Ford Williams; Dr. Stacy D. Travis; and Biltmore OB-Gyn, P.A. | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

### To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1*<br>Dr. Stacy D. Travis<br>24 Medical Park Dr.<br>Asheville, NC 28803 | *Name And Address Of Defendant 2*<br>Biltmore OB-Gyn, P.A.<br>24 Medical Park Dr.<br>Asheville, NC 28803 |
|---|---|

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>John C. Cloninger<br>Cloninger, Barbour, Searson, Jones & Cash, PLLC<br>21 Battery Park Avenue, Suite 201<br>Asheville, NC 28801 | *Date Issued*<br>12-16-16 | *Time* 3:01 ☐ AM ☒ PM |
|---|---|---|
| | *Signature* | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011

(Over)



STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

FILED IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

2016 DEC 16  P 3: 01        16 SV 05347

BUNCOMBE CO., C.S.C.

KRISTIANA TWEED BURRELL,
INDIVIDUALLY, AND AS
ADMINISTRATRIX OF THE ESTATE
OF ARIEL GRACE BURRELL,
DECEASED

Plaintiff,

v.

BAYER CORPORATION, an Indiana
corporation;
BAYER HEALTHCARE LLC, a
Delaware corporation; BAYER
ESSURE®, INC., (F/K/A CONCEPTUS,
INC.) a Delaware corporation; BAYER
HEALTHCARE PHARMACEUTICALS,
INC., a Delaware corporation;
CHRISTOPHER FORD WILLIAMS;
DR. STACY D. TRAVIS; and
BILTMORE OB-GYN, P.A.,

Defendants.

**COMPLAINT**
**JURY TRIAL DEMANDED**

**COMP**
**MDML**
**NEGO**
**PROD**
**UDTP**

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Kristiana Tweed Burrell, Individually, And As Administratrix Of

The Estate Of Ariel Grace Burrell, Deceased, and files her Complaint seeking judgment against

Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC; BAYER ESSURE®, INC.

(F/K/A CONCEPTUS, INC.); BAYER HEALTHCARE PHARMACEUTICALS, INC.

(hereinafter collectively referred to as "Bayer Defendants" or "Bayer"); CHRISTOPHER FORD

WILLIAMS; DR. STACY D. TRAVIS; and BILTMORE OB-GYN, P.A., for personal injuries

suffered by Plaintiff, Kristiana Tweed Burrell, and the wrongful death of her stillborn child, Ariel

Grace Burrell, as a result of medical malpractice by Defendants Dr. Stacy Travis and Biltmore OB-Gyn, P.A., and as a result of Plaintiff being implanted with the defective and unreasonably dangerous product, Essure®.

## I. INTRODUCTION

1. The primary responsibility for timely communicating complete, accurate and current safety and efficacy information related to a medical device rests with the manufacturer; the manufacturer has superior, and in many cases exclusive, access to the relevant safety and efficacy information, including post-market complaints and data.

2. To fulfill this essential responsibility, a manufacturer must vigilantly monitor all reasonably available information. The manufacturer must closely evaluate the post-market clinical experience with the device and its components and timely provide updated safety and efficacy information to the healthcare community and to consumers. The manufacturer also must carefully monitor its own manufacturing operations and quality controls to ensure that the device uniformly conforms to the manufacturer-approved design, as well as its representations and warranties and with specifications of approval.

3. When monitoring and reporting adverse events as required by both federal regulations and state law, including North Carolina law, time is of the essence. The purpose of monitoring a product's post-market experience is to detect potential safety signals that could indicate to the manufacturer and the medical community that a public safety problem exists. If a manufacturer waits to report post-market information, even for a few weeks or months, that bottleneck could cause researchers, regulatory bodies, and the medical community to be years behind in identifying a public safety issue associated with the device. In the meantime, more patients are harmed by using the product without understanding its true risks. This is why a manufacturer must not only completely and accurately monitor, investigate and report post-market experience, but it must also report the data as soon as it is received.

4. This action arises from Bayer Defendants' failures of their post-market responsibilities to

monitor and warn about serious health risks that emerged after their permanent birth control device, Essure®, began to be sold in the United States. In 2002, the U.S. Food and Drug Administration ("FDA") approved the device for sale in the United States based on clinical studies of only 745 women presented by the device manufacturer. When the FDA approved the device, the FDA was not aware that the device could cause serious health risks, such as perforation of the uterus, device migration or fracture, chronic pain, and prolonged bleeding, as well as ectopic pregnancies.

5. After the FDA approved the device for sale and it began to be implanted in patients in a real world setting, Bayer Defendants became aware of serious adverse events that should have led them to: (a) directly inform healthcare providers and consumers of these risks by revising the warning label for the device; and (b) report the adverse events to the FDA. For example, Bayer failed to warn health care providers and consumers about roughly 30,000 complaints of serious injuries associated with Essure® after the device was approved for sale. Bayer also failed to timely report this new information to the FDA, which, upon evaluating the information, required a black box warning to reflect serious health risks that were ultimately suffered by Plaintiff. If Bayer had timely and adequately warned Plaintiff's health care providers and Plaintiff of this new risk information, Plaintiff's injuries would have been avoided.

6. Not only did Bayer fail to warn about Essure®'s serious health risks, they concealed quality control problems that plagued their manufacturing process and led to material flaws in the devices, which caused device failures in many patients. Despite all of this, Bayer persisted in conducting a nationwide false and misleading marketing campaign. They represented that Essure® was safer than other methods of permanent birth control; Essure® "eliminates the risks, discomfort and recovery time associated with surgical procedures;" Essure® devices "stay secure, forming a long protective barrier against pregnancy;" Essure® is "worry free," and "it's the most effective permanent birth control by far." In Bayer's words, their marketing strategy aimed to capitalize on a physicians' position of trust with patients.

7. Bayer's conduct violated their obligations under relevant federal and state law, including

North Carolina law, governing the post-market conduct of Class III medical device manufacturers.

## II. PARTIES, JURISDICTION AND VENUE

8. The Court has jurisdiction over each defendant because each defendant is either a resident and citizen of North Carolina and/or has continuing minimum contacts with the State of North Carolina, or is doing business and is engaged in substantial activity within North Carolina, or has committed torts or breached warranties and committed acts or omissions in North Carolina which resulted in personal injury or wrongful death in North Carolina, and as for the Bayer Defendants, committed torts or breached warranties and committed acts or omissions which resulted in personal injury or wrongful in North Carolina, at a time when solicitations or services were carried on within North Carolina, by or on behalf of these defendants and products, materials or things processed, serviced or manufactured by these corporate defendants were used or consumed, within North Carolina in the ordinary course of trade. This Court also has jurisdiction based upon the amount in controversy.

9. Venue is proper in this county in accordance N.C.G.S. § 1-82, because Kristiana Tweed Burrell resides in Buncombe County, received medical treatment from Dr. Stacy D. Travis in Buncombe County, and was implanted with the medical device in Buncombe County. Defendant Biltmore OB-Gyn, P.A., is a professional association located and doing business in Buncombe County. Further, Ariel Grace Burrell died in Buncombe County.

10. Plaintiff Kristiana Tweed Burrell, Individually And As Administratrix Of The Estate Of Ariel Grace Burrell, Deceased, is an individual, who is a citizen of the State of North Carolina. Mrs. Burrell resides at 289 Garren Creek Rd. Fairview, NC 28730. On June 8, 2015, Mrs. Burrell gave birth to a baby, who was stillborn, named Ariel Grace Burrell. Kristiana Tweed Burrell brings this suit in her individual capacity for the personal injuries she sustained as a result of medical malpractice and the Essure® device implanted in her by Dr. Stacy D. Travis, and for the wrongful death of her daughter, Ariel Grace Burrell. "The real party in interest in any wrongful death action is the beneficiary for whom the recovery is sought. In the case of a stillborn fetus, the

beneficiaries of a wrongful death action will necessarily be the child's parents, unless they too are dead. *See* N.C.G.S. § 29-15(3) (1984)." *DiDonato v. Wortman*, 320 N.C. 423, 426, 358 S.E.2d 489, 491 (1987) (citing *In re Ives' Estate*, 248 N.C. 176, 102 S.E.2d 807 (1958); *Davenport v. Patrick*, 227 N.C. 686, 44 S.E.2d 203 (1947)). Kristiana Tweed Burrell and her husband Travis Burrell are the parents of Ariel Grace Burrell, Deceased. On December 15, 2016, Kristiana Tweed Burrell was appointed as the Administratrix of her deceased daughter's estate and has standing and authority to bring this cause of action. *Greer v. Parsons*, 331 N.C. 368, 371–72, 416 S.E.2d 174, 175–76 (1992).

11. Defendant BAYER CORPORATION. is a for-profit corporation incorporated in the state of Indiana and is a wholly owned subsidiary of Bayer A.G. BAYER CORP. is authorized to and does business throughout the State of North Carolina. BAYER CORPORATION.'s principal place of business is in Pittsburgh, Pennsylvania.

12. Defendant BAYER HEALTHCARE LLC is a for-profit limited liability company organized under the laws of the state of Delaware with its principal places of business located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205 and 100 Global View Drive, Warrendale, Pennsylvania. BAYER HEALTHECARE LLC's is a wholly owned subsidiary of Bayer A.G. and its sole member is Defendant BAYER CORPORATION. Defendant is authorized to and does business throughout the State of North Carolina.

13. Defendant BAYER ESSURE® INC. (F/K/A CONCEPTUS, INC.) is a for-profit corporation incorporated in the state of Delaware and is a wholly owned subsidiary of Bayer A.G. and/or Bayer HealthCare LLC. Conceptus, Inc. ("Conceptus") was founded in 1992 by Julian Nikolchev, a self-described "medical technology developer and serial entrepreneur." On or about April 28, 2013, Conceptus, Inc. entered into an Agreement and Plan of Merger (the "Merger Agreement") with Bayer HealthCare LLC. On or about June 5, 2013, pursuant to the Merger Agreement, Conceptus, Inc. became a wholly owned subsidiary of Bayer HealthCare LLC and/or Bayer A.G., and thereafter was renamed "Bayer Essure® Inc." For purposes of this Complaint, Conceptus, Inc. and Bayer Essure® Inc. are one and the same. Bayer Essure® Inc.'s headquarters

were located at 1021 Howard Avenue, San Carlos, California 94070 until 2005 when they relocated to 331 East Evelyn Avenue, Mountain View, California 94041. In July of 2013, Bayer Essure® Inc. moved its headquarters to 1011 McCarthy Boulevard, Milpitas, Santa Clara County, California 95035. Upon information and belief, as of May 20, 2016, Bayer Essure® Inc. surrendered its right to conduct intra-state business in the state of California and relocated its principal place of business to New Jersey. As of April 21, 2016, Bayer Essure® Inc.'s headquarters is located at 100 Bayer Boulevard, Whippany, New Jersey and Bayer Essure® Inc.'s principal place of business is in New Jersey. Bayer Essure® Inc. is a citizen of Delaware and New Jersey.

14. Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is a for-profit corporation incorporated in the state of Delaware and is a wholly owned subsidiary of Bayer A.G. BAYER HEALTHCARE PHARMACEUTICALS, INC.'s principal place of business is in Montville, New Jersey. BAYER HEALTHCARE PHARMACEUTICALS, INC is authorized to and does business throughout the State of North Carolina.

15. Defendant Christopher Ford Williams is a Citizen of the State of North Carolina and resides at 22512 Torrence Chapel Rd, Cornelius, NC 28031-6795. He is a Senior Sales Consultant and Field Sales Trainer at Bayer Healthcare (Conceptus) in the Charlotte, North Carolina Area. Mr. Ford was the representative and trainer for the Bayer Defendants who detailed Dr. Stacy D. Travis, and was physically present and training Dr. Travis on or about December 20, 2013 when she implanted Kristiana Tweed Burrell with the Essure® birth control device.

16. Defendant Stacy D. Travis is a Citizen of North Carolina and licensed physician in North Carolina practicing at BILTMORE OB-GYN 24 Medical Park Drive Asheville, NC 28803. She is the physician who implanted Kristiana Tweed Burrell with the Essure® birth control device on or about December 20, 2013 at Mission Hospital in Ashville, NC.

17. Defendant Biltmore OB-Gyn, P.A., was founded in 1995 by Dr. Stacy D. Travis and is located at 24 Medical Park Drive Asheville, NC 28803. Plaintiff Kristiana Tweed Burrell was seen and treated by Dr. Stacy D. Travis at Biltmore OB-Gyn, P.A., including treatment related to the implantation of the Essure® birth control device. Upon information believed, at all relevant

times, Dr. Travis was an actual and/or apparent agent, manager, servant and/or employee of Biltmore OB-Gyn, P.A., and all times acted within the scope of her authority, agency, and/or employment and in furtherance of the business of Biltmore OB-Gyn, P.A.

18. At all times relevant hereto, Essure® was manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by the Bayer Defendants.

19. At all times herein mentioned, there existed a unity of interest, and activity in furtherance of that interest, among Bayer Defendants such that any individuality and separateness among them has ceased, and the Bayer Defendants are the alter egos of each other with respect to Essure® operations.

20. The Bayer Defendants acted jointly and in combination with one another to take advantage of each Bayer Defendants' resources, personnel, services, sales, marketing and promotional networks in an effort to advance their misleading nationwide marketing scheme for Essure®. This includes the Bayer Defendants transacting, soliciting and conducting business in North Carolina through their offices, employees, agents and/or sales representatives, from which they derived substantial revenue in North Carolina.

21. At all times herein mentioned, the Bayer Defendants, jointly and individually, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing, and/or advertising for sale, and selling the Essure® device. These products were for use by the Plaintiff and Plaintiff's physicians and were implanted into Plaintiff in the same condition as when the Essure® devices left the Bayer Defendants' control. As such, each of the Bayer Defendants are individually, as well as jointly and severally, liable to the Plaintiff for her damages.

22. There is no basis for federal court jurisdiction over this matter. Plaintiff has not pleaded nor does Plaintiff intend to plead any claim cognizable under federal law or any federal code, regulation, rule, statute, or otherwise. Moreover, there is no diversity of citizenship between

Plaintiff and all Defendants.

### III. DESCRIPTION OF ESSURE®

23. Essure® is a medical device manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by The Bayer Defendants.

24. Essure® was first manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Conceptus, Inc. and initially developed under the name Selective Tubal Occlusion Procedure or "STOP™" Permanent Contraception device.

25. Essure® is touted as a form of permanent female birth control (female sterilization) with a 99.74% effectiveness rate of preventing pregnancy. The Bayer Defendants marketed the device as being safer and more effective than alternative forms of birth control. The device was developed to prevent pregnancy through the insertion of micro-inserts into the fallopian tubes that then expand and anchor, causing fibrous tissue growth and, in turn, bilateral occlusion (blockage) of the fallopian tubes. The Bayer Defendants intended the device to be implanted "permanently," *i.e.*, for each patient's lifetime.

26. Essure® consists of three components: (1) two micro-inserts; (2) a disposable delivery system; and (3) a disposable split introducer. All components are intended for a single use.

27. The micro-inserts are composed of two metal coils: one coil made of nitinol (nickel and titanium) and the other made of steel with polyethylene terephthalate ("PET") fibers wound in and around the coil. The micro-inserts are placed in a woman's fallopian tubes via The Bayer Defendants' disposable delivery system.

28. The Bayer Defendants' disposable delivery system consists of a single handle that contains a nitinol core delivery wire, release catheter, and delivery catheter. The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery, and release. Physicians monitor this process through hysteroscopic equipment, including a hysteroscope, a lightbox, and

a monitor, collectively known as a "tower." Upon information and belief, the towers were valued at approximately $20,000 and were provided by The Bayer Defendants to physicians for free if the physician purchased twenty-five Essure® units.

29. The hysteroscopic equipment is not part of the Essure® device or its pre-market approval process, but the equipment is necessary for proper implantation of the Essure® device. Defendant Bayer's website warned physicians, "[i]n order to be trained in Essure® you must be a skilled operative hysteroscopist."

30. After placement of the coils in the fallopian tubes, the micro-inserts are intended to expand and anchor into the fallopian tubes. The Bayer Defendants claim in their physician training manual and patient information booklets that the expanded coils and a chronic inflammatory and fibrotic response to the PET fibers elicit tissue growth that blocks the fallopian tubes and prevents pregnancy. According to the Bayer Defendants, "the tissue in-growth into the insert caused by the PET fibers results in both insert retention and pregnancy prevention."

31. In an initial clinical trial of 99 subjects, Conceptus aimed to assess the ability of the inserts to anchor in the fallopian tubes by asking doctors to perform a subjective "tug test." Thus, early on The Bayer Defendants recognized that correct placement of the device was often a subjective determination.

32. The Bayer Defendants claim that "correct placement" of Essure® "is performed easily because of the design of the microinsert," and the physician training manuals suggest the system and hysteroscope allow for visual confirmation of each insert's proper placement during the implant procedure. The Bayer Defendants further claim in advertising materials that the coils will remain securely in place in the fallopian tubes for the life of the patient, claiming, for example, Essure® is a "proven permanent birth control procedure that works with your body to create a natural barrier against pregnancy" and that it is "not reversible."

33. The Instructions for Use ("IFU") accompanying the Essure® device provide that patients should be counseled to receive a confirmation test three months post-implant to determine that the coil micro-inserts have created a complete occlusion in each fallopian tube. The Confirmation

Test is performed using a hysterosalpingogram ("HSG Test") and, as of July 2015, a transvaginal ultrasound ("TVU").

34. The Bayer Defendants have stated in a publicly available Form 10-K filed with the U.S. Securities and Exchange Commission that HSG is "often painful" and "is also known to be highly inaccurate, with false-positive results in as many as 40% of HSG-diagnosed cases of proximal tubal occlusion ("PTO"). Various factors are believed to be responsible for these false indications of tubal occlusion, including tubal spasm (a natural function of the tubes) and a build-up in the tube of natural cellular debris and mucous." The Bayer Defendants did not, however, share this information with patients in their marketing materials.

35. Since Essure®'s market entry in 2002, the device has undergone several design changes. The Selective Tubal Occlusion Product ("STOP") device was the original model used in the two clinical trials (STOP 10 and STOP2000) submitted in an effort to obtain FDA approval of the device. The first U.S. launched device was the ESS205 model, which was the same inserts as the STOP device, but incorporated a different delivery system (i.e., support catheter). The original support catheter was discontinued because the Bayer Defendants perceived it as the reason that the inserts were perforating women's fallopian tubes and causing pelvic pain. Additional changes were later made to the delivery system. In 2007, the Bayer Defendants changed the shape of the inserts by removing the tapered "pigtail" at the proximal end of the outer coil and renamed the device the ESS305 model.

## IV. PRE-MARKET APPROVAL OF ESSURE®

36. In April 2002, Conceptus submitted its Premarket Approval Application to the FDA for the Essure® device.

37. Premarket Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices based on the information available at the time. *See* 21 U.S.C. § 360(e); 21 C.F.R. § 814.3(e).

38. Under 21 C.F.R. § 814.20, a PMA and/or PMA Supplement application must provide:

a.  proposed indications for use;

b.  device description including the manufacturing process;

c.  any marketing history;

d.  summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk considerations);

e.  each of the functional components or ingredients of the device;

f.  methods used in manufacturing the device, including compliance with current good manufacturing practices; and

g.  any other data or information relevant to an evaluation of the safety and effectiveness of the device known or that should reasonably be known to the manufacturer from any source, foreign or domestic, including information derived from investigations other than those proposed in the application and from commercial marketing experience.

39. On November 4, 2002, the FDA conditionally approved the Essure® PMA application.

40. Because the FDA approval in 2002 was based on studies of only 745 clinical trial patients for a short period of time, the Bayer Defendants understood at that time that the long-term nature of the human body's tissue response to the Essure® inserts was unknown. The majority of the clinical trial data regarding PET in the fallopian tube was based on only 12–24 months of implantation. Beyond 24 months, therefore, the nature of the body's cellular and fibrotic response to the inserts and the ability of the devices to maintain occlusion were unknown. The FDA advised Conceptus of these facts and emphasized their special significance with respect to the risk of ectopic pregnancies, putting Conceptus on clear notice that the company's duty to vigilantly monitor and report the real world clinical experience with the device was paramount. Thus, the importance of maintaining the integrity of post-marketing data collection and reporting was known to the Bayer Defendants from the outset.

41. Conceptus falsified the records of patients who participated in clinical trials. For example,

Kimberly Hudak was an Essure® clinical trial patient. During her participation in the trial she responded to questions from a Conceptus representative regarding whether she experienced pain, adverse events, or changes to her usual state of health that she attributed to the device. Although Ms. Hudak reported that she experienced unusual pain, the Conceptus representative recorded that she did not.

42. The FDA's Conditional Premarket Approval ("CPMA") Order for Essure® established several requirements for the manufacturer, and the CPMA expressly made non-compliance with any of these requirements a violation of federal law. For example, the CPMA required that the manufacturer:

    a.    conduct a post-approval study in order to gather long-term safety and effectiveness data on Essure®;

    b.    conduct a post-approval study in the U.S. to "document the bilateral placement rate [of Essure®] for newly trained physicians";

    c.    annually report on the patients who participated in the post-approval studies;

    d.    ensure that any warranty statements are truthful, accurate, not misleading and are consistent with applicable federal and state laws;

    e.    submit a PMA supplement when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification. In the case of a labeling modification under these circumstances, the type of mandatory PMA supplement to be submitted was a "Special PMA Supplement – Changes Being Effected," which allowed the manufacturer to implement its label change without prior FDA approval;

    f.    submit annual post-approval reports to the FDA including reports of data from any clinical or nonclinical laboratory studies involving the device and reports in the scientific literature concerning the device;

    g.    submit a report to the FDA within 10 days after The Bayer Defendants receive or have knowledge or information of any adverse reaction, side effect, injury, toxicity,

or sensitivity reaction that has not been addressed by the device's labeling or has been addressed by the device's labeling but is occurring with unexpected severity or frequency. The express purpose of this requirement was to provide continued reasonable assurance of the safety and effectiveness of the device;

h.    submit a report to the FDA within 10 days after The Bayer Defendants receive or have knowledge or information of any failure of the device to meet specifications established in the approved PMA that are not correctable by adjustments or procedures described in the approved labeling;

i.    include in the Annual Report a bibliography and summary of information from unpublished reports of data from any clinical investigations or non-clinical laboratory studies involving Essure® as well as reports in the scientific literature concerning Essure®;

j.    include in the Annual Report any failures of the device to meet the specifications established in the approved PMA that were correctable by procedures described in the approved labeling; and

k.    "[r]eport to the FDA whenever it received information from any source that reasonably suggested that the device may have caused or contributed to a serious injury".

43. The CPMA order for Essure® further outlined reporting requirements that the Bayer Defendants were required to follow under the Medical Device Reporting regulations ("MDR"). Under these requirements, the Bayer Defendants were required to:

a.    report to the FDA within thirty (30) days whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device may have caused or contributed to serious injury; and

b.    report to the FDA within thirty (30) days whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device has malfunctioned and would be likely to cause or contribute to serious injury if the

malfunction were to recur.

44. The CPMA order acknowledged the Bayer Defendants' obligation and ability to update safety warnings for Essure® without prior FDA approval by utilizing the "Changes Being Effected" provision in 21 C.F.R. § 814.39(d)(2).

45. The FDA made clear in the CPMA order that "[f]ailure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the Act."

## V. THE BAYER DEFENDANTS BREACHED THEIR OBLIGATION TO UPDATE WARNINGS AND REPORT ADVERSE EVENTS

46. Approval of a device through the PMA process signals the beginning, not the end, of a device manufacturer's duties to patients under both federal regulations and established state law, including North Carolina law. The FDA's initial approval of a device label amounts to a finding by the FDA that the label is adequate for purposes of gaining initial approval to market the device. It does not represent a finding by the FDA that the label can never be deemed inadequate after approval as new safety information from the real world experience with the device becomes available to the manufacturer. Sound reasons support these principles: there are products, such as Essure®, for which evidence of the device's defects comes to light only after the device is used in a real world setting.

47. After Essure® received pre-market approval, the Bayer Defendants were at all times responsible for maintaining the labeling of Essure® in light of the most current risk information obtained from the real world clinical experience with the device. There is no federal requirement that a manufacturer maintain its original warning language in the face of new safety information. Nor does federal law give device manufacturers a right to market their device using the label originally approved by the FDA when new post-market information bearing on the safety of the device comes to light. To the contrary, the FDCA required the Bayer Defendants not to sell a device that was accompanied by an inadequate warning or had a label that was false or misleading

in any respect, 21 U.S.C. § 352(a), (f)(2), because such a deficient warning rendered the device "misbranded" under 21 U.S.C. § 331, as well as the Sherman Food, Drug, and Cosmetic Laws. West's Ann. Cal. Health & Safety Code § 111330.

48. The Bayer Defendants had the ability under federal law, and the duty under state and federal law, to directly warn healthcare providers and consumers by unilaterally updating the labeling of Essure® to reflect newly acquired safety information without advance approval by the FDA. 21 C.F.R. § 814.39(d) and CPMA order, Conditions of Approval. The options available to The Bayer Defendants include:

    a.     labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

    b.     labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

    c.     labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

    d.     changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

49. The Bayer Defendants breached their duties under federal law and state law, including North Carolina law, to maintain labeling that: (a) added warnings about the adverse reactions alleged herein for which there was reasonable evidence of a causal association; (b) added instructions for use that would enhance the safe use of the device; and (c) added descriptions of adverse events to ensure that the labeling was not false or misleading.

50. The Bayer Defendants post-approval obligations under federal law also included duties to:

    a.     report to the FDA information suggesting that one of the Manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur,

and conduct an investigation of each event and evaluate the cause of the event, 21 C.F.R. §§ 803.50, et seq.;

b.    monitor the product after pre-market approval and discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product, 21 C.F.R. §§ 814, et seq.;

c.    submit a PMA Supplement for any change in Manufacturing Site, 21 C.F.R. §§ 814.39, et seq.;

d.    establish and maintain quality system requirements to ensure that quality requirements are met, 21 C.F.R. § 820.20, et seq.;

e.    establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, 21 C.F.R. §§ 820.30, et seq.;

f.    document all Corrective Action and Preventative Actions taken by the Manufacturer to address non-conformance and other internal quality control issues, 21 C.F.R. §§ 820.100, et seq.;

g.    establish internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198 and §§ 820.100, et seq.;

h.    establish Quality Management System ("QMS") procedures to assess potential causes of non-conforming products and other quality problems, 21 C.F.R. §§ 820.70, et seq. and 21 C.F.R. §§ 820.90, et seq.;

i.    report on Post Approval Studies in a timely fashion, 21 C.F.R. §§ 814.80, et seq.; and

j.    advertise the device accurately and truthfully, 21 C.F.R. §§ 801, et seq.

51. Had the Bayer Defendants fulfilled these obligations in a timely fashion, which federal and state law required them to do, Plaintiff's injuries would not have occurred. The Bayer Defendants failed to do so.

52. The claims in this case concern the Bayer Defendants' duties that arose after premarket approval of Essure®, when the Bayer Defendants learned of new information bearing on the safety of its device. The Bayer Defendants breached these duties to take reasonable steps to prevent foreseeable and intended risks, including to the Plaintiff.

53. Under state law, including North Carolina law, the Bayer Defendants had a duty to exercise reasonable care in adequately warning Plaintiff and/or Plaintiff's physicians about the dangers of Essure® that were known or knowable to The Bayer Defendants at the time of distribution. Under both federal and state law, the Bayer Defendants also have a post-market duty to monitor and report adverse events and risks associated with the device.

54. Despite having knowledge and possession of evidence that showed the use of Essure® was dangerous and likely to place users' health at serious risk, the Bayer Defendants failed to disclose and warn of the health hazards and risks associated with Essure®. Instead, the Bayer Defendants marketed, advertised, and promoted Essure® while failing to monitor, warn, or otherwise ensure the safety and efficacy of its users in violation of state law, including North Carolina law, and FDA regulations.

55. The FDCA requires medical device manufacturers like the Bayer Defendants to maintain and submit information as required by FDA regulation, 21 U.S.C. § 360i, including submitting Adverse Reaction Reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198(a). Specifically, 21 C.F.R. § 803.50 requires a manufacturer to report information no later than 30 days after it is received, from any source, if that information suggests that the device may have contributed to a serious injury or has malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

56. The FDA publishes the adverse events and MDRs in a public, searchable database called MAUDE and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

*See* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.cfm

57. The Bayer Defendants had a duty under state law, including North Carolina law, to exercise reasonable care in warning Plaintiff and/or Plaintiff's physicians about the dangers of Essure® that were known or knowable to the Bayer Defendants at the time of distribution. The Bayer Defendants also had an obligation and the ability under federal regulations to maintain labeling that provided adequate warnings about risks and instructions for use; to conduct prompt, accurate and thorough post-market surveillance; to take action to ensure that the device can be used safely in accordance with the instructions; and to ensure that any labeling, warranties, or representations the Bayer Defendants made were not false or misleading in any respect. The Bayer Defendants' conduct here failed to meet these federal obligations and violated state law, including North Carolina law.

58. Throughout its existence, Conceptus accumulated hundreds of millions of dollars of debt and never achieved profitability.

59. By 2007, Essure® was the only product sold by Conceptus.

60. To protect the Essure® brand within the permanent birth control market, upon information and belief, the Bayer Defendants made a decision to hide their knowledge of serious safety risks from the FDA and public.

61. The FDA's Office of Regulatory Affairs ("ORA") is the lead office for all field activities, including inspections and enforcement. During an inspection, if ORA investigators observe conditions they deem to be objectionable, these observations are required to be listed on an FDA Form 483 when they indicate that an FDA-regulated product may be in violation of FDA requirements.

62. FDA Form 483s typically are discussed with a company's management team at the conclusion of the inspection. The Form 483 is not an all-inclusive list of every possible deviation from law and regulation. There may be other objectionable conditions that exist that are not cited on the FDA Form 483. Companies must take corrective action to address the cited objectionable conditions and any related, non-cited objectionable conditions that exist.

63. On or about December 2010, the FDA conducted a fifteen-day "For Cause" inspection. During the fifteen-day "For Cause" inspection, the FDA noted conditions that it found objectionable and/or constituted violations of the FDCA and related Acts.

64. The FDA Establishment Inspection Report for this inspection was issued on January 6, 2011, and stated the following:

a.     "My inspection of the complaint system of Conceptus Inc. found that the firm was not reporting complaints of loose micro-insert coils in the peritoneal or abdomino-pelvic cavity (*See* FDA483 Observation #2). . . . In some of these cases the micro-insert coil will migrate through the perforation in the tube and will be found on x-ray to be outside the female reproductive tract in the peritoneal cavity. Such cases will be reported as MDR by the firm if the patient is complaining of pain and a second procedure is required to remove the coil. However, the firm will not report such complaints if an abdominal located coil is removed during a laparoscopic tubal ligation performed because of failure of the Essure® procedure."

b.     During this inspection, Conceptus gave the FDA inspector "an Excel spreadsheet with all of the complaints opened since Jan. 1, 2008 [and] there were 16,581 complaint[s] from 1/1/08 until 12/6/10 listed. There were 182 MDRs reported in the same time period."

c.     Conceptus also gave the FDA inspector a more detailed complaint spreadsheet "that starts at 7/20/2010 and goes to 12/10/2010. That spreadsheet [had] a total of 2,752 complaints."

d.     The FDA inspector looked at the complaints for perforation and noted that "none of the perforation complaints were reported as MDRs."

e.     A review of the Risk Analysis Design Failure Mode Effects Analysis showed that it referenced perforation as a possible effect of the failure mode of the coil being too stiff, an explanation to how the manufacturing defects caused perforation. But, migration as a failure mode was not addressed.

65. The objectionable conditions were communicated to Conceptus by the FDA via a Form 483 dated January 6, 2011, and included the:

a.       failure to submit MDR determinations to the FDA within 30 days for reports of a serious injury involving the Essure® device, including but not limited to two reports of bowel perforation, one report of pain and the Essure® device breaking into pieces immediately following implant, and 41 complaints that involved perforation of the uterus or fallopian tubes;

b.       failure to submit MDR's to the FDA within 30 days for reports of a serious injury involving the Essure® device, including but not limited to five reports of the Essure® coils perforating the fallopian tubes and penetrating the peritoneal cavity;

c.       failure to submit MDR's to the FDA with reports of perforation with a post-procedural radiograph (HSG or CT) showing a coil in the abdominal or peritoneal cavity;

d.       failure to include perforation of the Essure® micro-coil insert into the peritoneal cavity in its Design Failure Mode Effects Analysis (DFMEA) for Essure®, despite having documented at least 508 complaints of perforation involving the Essure® device;

e.       failure to submit MDR's to the FDA for reports of the device failing to function as specified in the PMA when it would be likely to cause or contribute to serious injury; and

f.       failure to adequately document in a Corrective Action and Preventative Actions ("CAPA") an incident involving Conceptus's contract manufacturer using uncertified material in a validation protocol and failing to follow their own Standard Operating Procedure for control of non-conforming material. Upon information and belief, these failures resulted in manufacturing defects that harmed those implanted, including Plaintiff.

66. The FDA inspector specifically advised the Bayer Defendants that any instances of the

device migrating to, perforating, or penetrating areas in the body outside of the fallopian tubes constituted a malfunction and should be reported. In response, the Quality Manager at Conceptus told the inspector that he did not consider an Essure® device falling out of the fallopian tube because of a perforation to be a device malfunction.

67. Upon information and belief, just as the Bayer Defendants were not reporting such instances as MDRs, they were also not analyzing them as failure modes in Design Controls, nor were they performing their post-market obligations to ensure that the Essure® device was safe and effective as manufactured and in accordance with the requirements of the CPMA and FDA Regulations.

68. Conceptus' CEO had direct personal knowledge of the frequency, severity and permanence of the complications and risks associated with the Essure® device. Despite this knowledge, the Bayer Defendants failed to take necessary action—such as directing the filing of PMA Supplements, unilaterally updating its labeling through the CBE Process, or timely submitting MDRs—to advise users of Essure® of the defects and risks described above, violating federal and state law, including North Carolina law.

69. Because the Bayer Defendants failed to timely, completely, or accurately report their knowledge of risks and complications associated with the Essure® device, the public's knowledge of the risks associated with the Essure® device were seriously hampered and delayed. This endangered patient safety, including Plaintiff's safety.

70. On May 11, 2011, at the first quarter 2011 earnings call, Conceptus' CEO discussed the Bayer Defendants' plan to continue to promote Essure® as safe and effective despite the thousands of adverse event reports they had received.

71. He stated, "We intend to increase productivity, grow our physician pipeline, expand Essure® utilization, and drive greater patient adoption through integrated marketing." He again described Essure®'s "superior efficacy, reduced patient trauma, risk and recovery, and lower cost versus tubal ligation" to investors. He did not discuss how Conceptus had been put on notice of their violations of FDA regulations and failed to report serious adverse events to the FDA.

21

72. On August 4, 2011 at the second quarter earnings call, he further stated that the Bayer Defendants had a "comprehensive publication plan to keep physicians up to date on information that may impact their use of Essure®." Despite these statements, upon information and belief, the Bayer Defendants continued to underreport adverse events associated with Essure® to the FDA and medical community.

73. Upon information and belief, the Bayer Defendants intentionally, willfully, and maliciously concealed and/or suppressed material safety information regarding Essure® in order to increase sales of Essure®, protect the Essure® brand, and increase market share.

74. Upon information and belief, the Bayer Defendants received direct financial benefit from their tortious conduct.

75. In May and June 2013, the FDA conducted another inspection that included an evaluation of the Bayer Defendants' complaint handling and adverse event reporting practices. As part of the inspection process, the FDA requested a complete list of complaints since January 2011. The Bayer Defendants provided the FDA inspector with a spreadsheet containing 16,047 complaints Conceptus received on the Essure® device between January 2011 and the date of the inspection, only 183 of which were reported by The Bayer Defendants to the FDA as MDRs.

76. The inspector reviewed 29 random complaint forms received by the Bayer Defendants. None of the randomly reviewed complaints in which one or more coils were imaged outside of the fallopian tubes were reported to the FDA as MDRs.

77. Upon information and belief, from January 1, 2008 through May 2013, the Bayer Defendants were receiving on average over 15 complaints per day about their product and thousands of complaints each year. The Bayer Defendants timely reported only a tiny fraction of these complaints to the FDA.

78. The Bayer Defendants' actions violated the conditions of the Essure® CPMA, parallel state laws governing the post-marketing conduct of Conceptus, and FDA Regulations.

79. The Bayer Defendants had unique knowledge concerning the frequency, severity, and permanence of the complications and risks associated with the Essure® device. Despite this unique

knowledge, the Bayer Defendants failed to take necessary action—such as filing PMA Supplements, unilaterally updating its labeling through the CBE Process, or timely submitting MDRs—to advise users of Essure® of the defects and risks described above, violating state law, including North Carolina law.

80. The Bayer Defendants' actions violated the conditions of the Essure® CPMA and federal regulations and requirements governing the post-marketing conduct of the Bayer Defendants, including, but not limited to, 21 C.F.R. § 814.39(d). The Bayer Defendants' actions also separately violated parallel duties under state law, including North Carolina law, governing their post-marketing conduct.

81. Conceptus also failed to timely submit Post-Approval Studies under the Essure® CPMA. For example, a six-month report was due on August 24, 2012, but was not received by the FDA until December 14, 2012. Other reports were likewise untimely. If the Bayer Defendants had timely submitted accurate Post-Approval Studies, Plaintiff and her physicians would likely have received notice of these complaints.

82. The Bayer Defendants' actions violated the conditions of the Essure® CPMA, parallel state laws governing the post-marketing conduct of Conceptus, and FDA Regulations, including, but not limited to, 21 C.F.R. §§ 814.80, et seq.

83. By failing to update their labeling as new post-marketing information became available to ensure that its labeling remained both accurate and adequate, the Bayer Defendants also rendered Essure® a "misbranded" device under the FDCA, which forbid this device from being marketed. These actions also violated parallel state laws governing the Bayer Defendants' marketing representations and warnings. Despite this, The Bayer Defendants continued to improperly market Essure® for use in women, including the Plaintiff, at a time they were prohibited from doing so under federal law. The Bayer Defendants' actions separately violated duties under state law, including North Carolina law, governing their post-marketing conduct.

84. By failing to comply with several CPMA conditions and FDA post-marketing regulations prior to implantation into Plaintiff, Essure® was also considered to be an "adulterated" device

under § 501(f) of the FDCA and not allowed to be marketed. 21 U.S.C. § 351(h); 21 C.F.R. §§ 814.80, et seq. Despite this, the Bayer Defendants continued to improperly market Essure® for use in women, including the Plaintiff, at a time that they were prohibited from doing so under federal law. The Bayer Defendants' actions separately violated parallel duties under state law, including North Carolina law, governing their post-marketing conduct.

85. The Bayer Defendants' failure to timely file MDR's and to report to the FDA the complaints that were not addressed by the device's labeling and/or complaints that were occurring with an unexpected increase in severity and frequency, which it knew of from the more than 32,000 complaints that it received, violated the CPMA, FDA post-marketing regulations, and parallel state law. The Bayer Defendants' violations prevented Plaintiff, her physicians, and the public from understanding the true nature of Essure®'s adverse events, risks, and ineffectiveness.

86. The Bayer Defendants' actions violated duties under state law, including North Carolina law, governing their post-marketing conduct.

87. Prescribing and implanting physicians, healthcare providers, and patients, including Plaintiff and her healthcare providers, neither knew, nor had reason to know at the time of her use of Essure®, of the existence of the aforementioned adverse events and defects. Ordinary consumers would not have recognized the potential risks or side effects that the Bayer Defendants concealed and misrepresented through their promotion of Essure® as safe and effective for pregnancy prevention.

## VI. QUALITY PROBLEMS AND MANUFACTURING DEFECTS

88. The Bayer Defendants had a duty under state law, including North Carolina law, to exercise reasonable care in the manufacture, development, marketing, labeling, distributing, and sale of Essure® after it was approved for sale by the FDA in 2002. The Bayer Defendants also had the obligation and ability under federal regulations to ensure that the product was manufactured utilizing Good Manufacturing Practices and to maintain quality controls to adequately address, investigate, and assess manufacturing issues that arose from the device. The Bayer Defendants'

conduct failed to meet these federal obligations and violated parallel state law, including North Carolina law.

89. In June and July 2002, Conceptus did not have a quality control department. Instead, it contracted with an outside entity to periodically audit its manufacturing sites. During that time, the FDA inspected the Conceptus manufacturing facility in San Carlos, North Carolina and issued a Form 483 notice of violation reporting that: (1) design outputs identified as essential for the proper functioning of the device were not completely identified; (2) corrective and preventive action activities had not been documented, including implementation of corrective and preventive actions; (3) the procedures addressing verification or validation of corrective and preventive actions were not implemented; and (4) certain adverse events were not captured in the data submitted for Essure®'s PMA.

90. On June 25, 2002, the FDA conducted a six-day Post Market Approval inspection of the Conceptus San Carlos headquarters and manufacturing facility reviewing procedures, records and processes associated with the four major quality subsystems: Management Controls, Design Controls, Corrective and Preventive Actions, and Product and Process Controls.

91. During the six-day inspection, the FDA issued a Form 483 documenting the following two conditions, which it found objectionable and/or constituted violations of the FDCA and related Acts specific to the quality systems: (1) failure to analyze all quality data sources to identify existing and potential causes of nonconforming product and other quality problems related to the Essure® device; and (2) failure to follow procedures for the control of products that do not conform to specifications. Specifically, raw materials and sub-assemblies (i.e., Inner/Outer Coil Sub-assemblies) were being rejected during manufacturing, but no Material Review Reports were initiated/generated by Conceptus for these rejection. A review of Lot History Reports for the manufacture of Essure® showed raw materials rejected (hand-written) on the Work Order Picklist, but not documented on Quality Assurance Forms, which are used to track data to allow determination of trends in sources of product and quality, such as whether the raw materials and component parts conformed to specifications. Upon information and belief, these failures

contributed to manufacturing defects in the products that deviated in material composition and function from the approved design of the product. The use of non-conforming material rendered the affected products defective as manufactured. Upon information and belief, these defects were widespread and impacted many women, including the Plaintiff. The information concerning the precise scope of defects is uniquely within the Bayer Defendants' possession and control.

92. Shortly after beginning to manufacture the devices, Conceptus became aware post-market that the following manufacturing defects can occur with the device and lead to adverse consequences for patients:

    a.    the stainless steel used in Essure® can become un-passivated, which would allow it to rust and degrade;

    b.    the nitinol can form nickel-rich phases in the oxide layer during the manufacturing process susceptible to corrosion, allowing *in vivo* corrosion and release of high nickel content, which may trigger adverse immunologic responses;

    c.    the nitinol coils can fail to achieve the approved design standard flexibility due to the use of non-conforming materials or deviations from the manufacturing process protocol, resulting in coil stiffness that can cause perforation, migration, and pain;

    d.    the "no lead" solder can contain trace lead;

    e.    the nitinol in the device can degrade due to High Nickel Ion release, increasing the toxicity of the product for patients;

    f.    latent manufacturing defects, such as cracks, scratches, and other disruptions of the smooth surface of the metal coil, could compromise the physical integrity of the inserts, causing fractures, breakage, and excess nickel to leach into the surrounding tissues after implantation;

    g.    PET fibers degrade at 65 degrees Fahrenheit. Therefore, considerable degradation is expected at 98.6 degrees Fahrenheit in the human body, and degradation products of the PET used in the implant can be toxic to patients, inciting both chronic inflammation and autoimmune issues;

h. production of non-sterile devices; and

i. the mucosal immune response to nickel and PET fibers, which occurs in the fallopian tubes, has been more severe than the immune response in non-mucosal areas of the body.

93. The devices are not designed to deform, crack, fracture, or break before, during, or after implantation. Yet, the Bayer Defendants have received notices of each of these types of defects through adverse event reports during the relevant time frame, and the Bayer Defendants failed to (1) promptly investigate the cause of the manufacturing defects; (2) notify the public that they had occurred; (3) report the adverse events and the manufacturing defects to the FDA; (4) report a failure mode analysis to explain why the manufacturing defects occurred; and (5) report a corrective action plan to ensure that the manufacturing defects would not reoccur. All of these failures led to continued manufacturing defects and omissions of material information that in turn led to personal injuries in patients, including Plaintiff.

94. Upon obtaining knowledge of these device failure modes, the Bayer Defendants were required under the Essure® CPMA, 21 C.F.R. §§ 820.30, et seq., 21 C.F.R. §§ 820.100, et seq. and the FDA Recognized Consensus Standard ISO 14971 to use this information to routinely update the risk analyses for the Essure® device and take any and all CAPAs necessary to address non-conformance and other internal quality control issues. Furthermore, the Bayer Defendants were required to establish QMS procedures to assess potential causes of non-conforming products and other quality problems with the product, such as latent manufacturing defects. 21 C.F.R. §§ 820.70, et seq.; 21 C.F.R. §§ 820.30, et seq. Lastly, the Bayer Defendants were required to take necessary action—such as filing PMA Supplements, unilaterally updating their labeling through the CBE Process, and/or timely submitting MDRs—to advise users of Essure® of the defects and risks described above. The Bayer Defendants failed to comply with these FDA regulations and its parallel duties under state law, including North Carolina law, thereby jeopardizing the health of patients.

95. Upon information and belief, the Bayer Defendants' failure to establish QMS procedures

to assess potential causes of non-conforming products, their failure modes in patients, and other quality problems with the Essure® devices resulted in the use of non-conforming materials with manufacturing defects that resulted in migration, perforation, breakage and pain. Upon information and belief, these failures lead to manufacturing defects and patient injuries that were systematic, ongoing, and long-term.

96. Within a year of receiving the FDA's notice of violation concerning the non-conforming devices and inadequate quality controls, Conceptus ceased manufacturing the devices itself and began engaging a foreign contract manufacturer. That did not eliminate the manufacturing defects, however.

97. On March 24, 2004, Conceptus filed an express good manufacturing practice ("GMP") Supplement for the addition of a manufacturing site located at Venusa, Ltd. in Chihuahua, Mexico that was approved by the FDA on April 8, 2004. At that time, Conceptus transferred all of its manufacturing to the Chihuahua, Mexico site.

98. In September 2005, the FDA conducted a pre-announced inspection of the San Carlos headquarters. During the inspection, only two of the four subsystems reviewed in the 2003 inspection were covered: (1) Corrective and Preventive Actions; and (2) Management Controls. The FDA inspector noted in the Establishment Inspection Report under the Manufacturing/Design Operations section that, in 2004, Conceptus relocated all manufacturing and no longer manufactured the product on-site; however, the finished product went through quality control inspection and quality assurance testing at the San Carlos facility. Product and Process Controls were not investigated by the FDA during this investigation, but the FDA investigator noted "an ongoing issue with deployment/disengagement failure of the Essure® device tracing the issue back to . . . 4/8/2002."

99. On November 7, 2005, Conceptus entered into a three-year supply agreement with Accellent Corp., f/k/a Venusa, Ltd. to manufacture Essure® at its facility in Juarez, Mexico. It did not file the requisite PMA Supplement to advise the FDA of this manufacturing site, in violation of its post-marketing duties under 21 C.F.R. § 814.39. This failure to notify the FDA resulted in

Conceptus avoiding inspection of the facility and its manufacturing process for nearly two years.

100.    Although Conceptus had transferred all manufacturing in 2004 to Chihuahua, Mexico, it was not until June 25, 2007 that Conceptus sought approval from the FDA for a manufacturing site change from Conceptus, Inc. in Mountain View, California to its contract manufacturer, Accellent Corp., in Chihuahua, Mexico.

101.    On June 10 and 11, 2008, the California Department of Public Health, Medical Device Safety Section ("CDPH") conducted an inspection of The Bayer Defendants' 331 East Evelyn Avenue location in Mountain View, California. During this inspection, the CDPH issued a Notice of Violation to Conceptus for: (1) failing to obtain a valid license to manufacture medical devices after Conceptus moved from its previous location; and (2) failing to maintain its procedure for inventory transfer.

102.    In 2011, the FDA cited Conceptus for not developing a corrective plan when it learned that its contract manufacturer had been producing non-conforming devices since at least November 30, 2010. The Conceptus engineers also learned that the contract manufacturer had failed to follow its own standard operating procedures for control of non-conforming material.

103.    According to the FDA Inspection Classification Database Search, Accellent Inc. d/b/a Lake Region Medical Inc. in Juarez, Mexico was not inspected until August 7, 2014, when Conceptus was again issued a Form 483 after the FDA again found objectionable conditions or practices.

104.    On June 9, 2015, the FDA approved a manufacturing site located at Bayer Healthcare SRL in Heredia, Costa Rica, and the facility was officially opened on August 27, 2015.

105.    This conduct by the Bayer Defendants violated the conditions of the Essure® CPMA and good manufacturing processes. For example, the CPMA required the Bayer Defendants to notify the FDA when device failures necessitated a manufacturing or device modification, as well as when any chemical, physical or other change or deterioration in the device or any failure of the device to meet the specifications occurred. The Bayer Defendants' conduct invalidated the CPMA and violated parallel state laws governing the post-marketing conduct by Conceptus. In addition,

this conduct violated FDA regulations including, but not limited to, 21 C.F.R. § 814.39, 21 C.F.R. §§ 820.70, et seq., as well as the Sherman Food, Drug and Cosmetic Laws, West's Ann. Cal. Health & Safety Code § 111295.

106.    Upon information and belief, the Bayer Defendants' failure to establish and maintain procedures to ensure that the Essure® device, as manufactured, conformed to its approved product specifications—particularly related to non-conforming material and the inadequate quality assurance and failure mode analysis—is well documented and resulted in manufacturing defects causing harm to many women, including Plaintiff. Upon information and belief, these failures were ongoing and systematic, resulting in manufacturing defects in the product.

## VII. THE BAYER DEFENDANTS AND CHRISTOPHER FORD WILLIAMS ENGAGED IN FALSE AND MISLEADING SALES AND MARKETING TACTICS

107.    The Bayer Defendants and Christopher Ford Williams violated the Essure® CPMA and §§ 502(q) and (r) of the FDCA and parallel state laws by engaging in false and misleading advertising of Essure®.

108.    The Bayer Defendants continue to sell their product with misleading and false advertising in violation of the conditions of the Essure® CPMA and state laws.

109.    The marketing campaign for Essure® was described by the Bayer Defendants as follows: "Through the use of public relations and targeted advertising, we intend to increase awareness of Essure® among consumers, general practitioners and the broader medical community. In April 2003, we presented Essure® at the annual conference of the American College of Obstetricians and Gynecologists. At this meeting, we had two presentations and there was a Continuing Medical Education, or CME, accredited symposium with Essure® as the main topic. In early June 2003, we commenced a direct mail campaign to 500,000 women in the Atlanta and Chicago areas, with the goal of encouraging these women to contact our call center for additional information. In turn, our call center has the ability to offer a referral to a practicing Essure® physician in a consumer's area. We had also conducted regional advertisement in a variety

of magazines, such as *Parents* and *Self.* "

110.     In addition, the Bayer Defendants operated websites for "physicians and patients" and "established a call center for patients  are seeking additional information about Essure® and who wish to be referred to physicians that are trained to perform the Essure® procedure. Physicians that we refer our patients to are those that have chosen to participate in our Essure® Accredited Practice program aimed at providing an optimal patient experience." In reality, the training and medical comprehensiveness of the Essure® Accredited Practice program is a falsehood.

111.     The Bayer Defendants and Christopher Ford Williams knew or should have known Essure®'s marketing campaign claims included misrepresentations and omissions of material safety information. At the February 19, 2007 fourth quarter earnings call, Conceptus' CEO stated the role of this campaign was to "educate patients on the benefits and drive them to the physician's office asking for Essure®."

112.     At the February 19, 2007 fourth quarter earnings call, he further stated, "We are stressing the differences between the Essure® procedure, and the tubal that are of primary concern to each audience the patient and the physician. For patients, the message is no cutting, no going under general anesthesia, no recovery, no hormones, and no guessing…. For physicians, we are capitalizing on their position of trust with the patient and the obvious choice for them to recommend Essure®, a true office procedure with superior effectiveness. These messages carry not only to OB GYNs but also through direct mail to family and general practitioners who often refer out but do not perform tubal ligations. We believe these docs can be strong endorsers of Essure® as well."

113.     The Bayer Defendants and Christopher Ford Williams willfully disseminated false and misleading information at a time when they knew or should have known there were no reasonable grounds for believing these claims to be true when considered in light of the post-market safety information in the possession of the Bayer Defendants and Christopher Ford Williams.

114.     Despite the fact that evidence existed that the use of Essure® was dangerous and likely to place users at serious risk to their health, the Bayer Defendants failed to disclose the health

hazards and risks associated with Essure® to the FDA, physicians, and patients. Instead, the Bayer Defendants and Christopher Ford Williams marketed, advertised, and promoted Essure® while failing to warn or otherwise ensure the safety of its users in violation of parallel state law, including North Carolina law, the Essure® CPMA, and FDA regulations.

115.     The Bayer Defendants advertised, promoted, and marketed on their websites, in print and/or video advertisements, brochures, and fact sheets stating the following about Essure®, while failing to report the actual material facts:

    a.     The Essure® patient brochure stated Essure® was the "[o]nly FDA approved female sterilization procedure to have zero pregnancies in the clinical trials" or words to that effect. However, there were actually four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience. Additionally, several pregnancies were reported subsequent to Essure® implantation. From 1997 to 2005, 64 pregnancies were reported to The Bayer Defendants. An Adverse Event Report related to the ESS 205 device dated October 3, 2006 evidences an ectopic pregnancy, which can be life-threatening to the mother, after the three-month Confirmation Test was confirmed. Furthermore, a recent study indicates that women implanted with Essure® have a ten times greater risk of pregnancy after one year than those who use laparoscopic sterilization. At ten years, the risk of pregnancy is almost four times greater.

    b.     The Essure® website, print advertising, and patient brochure described Essure® as "[s]urgery-free" or words to that effect. However, Essure® is not "surgery-free." All Essure® procedures are done under hysteroscopy, which is a surgical procedure. The Bayer Defendants also failed to disclose post-market adverse events arising from the implant, and that many of those events required surgery to remove the device. In reality, a recent controlled study of this device found that women who were implanted with the Essure® device were ten times more likely to need reoperations over women who had tubal ligations.

c.    The Essure® website, print advertising and patient brochure described Essure® as "[w]orry free," and a "simple procedure performed in your doctor's office" that takes "less than 10 minutes" and "requires no downtime for recovery" and "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures" or words to that effect. However, The Bayer Defendants concealed and failed to report complaints of perforations and pain that occurred as a result of Essure® as noted above. Essure® can cause women serious, life-altering complications including, but not limited to, debilitating pain, heavy bleeding necessitating medication, and/or additional surgical procedures, allergic reactions (including, but not limited to, rashes, itching, bloating, swelling, headaches, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications. The Bayer Defendants failed in their post-market obligations to monitor and report these serious adverse events.

d.    The Essure® website, print advertising and patient brochure stated "[t]he Essure® inserts stay secure, forming a long protective barrier against pregnancy. They also remain visible outside your tubes, so your doctor can confirm that they're properly in place" or words to that effect. However, the micro-inserts do not necessarily remain secure and can migrate and/or be expelled by the body, as evidenced by the multiple complaints concerning perforation that were inadequately monitored and reported by the Bayer Defendants.

e.    The Essure® website, print advertising and patient brochure stated the "Essure® inserts are made from the same trusted, silicone free material used in heart stents" or words to that effect. However, the micro-inserts are not made from the same material as heart stents. Specifically, the micro-inserts are made of PET fibers that trigger inflammation and scar tissue growth. The PET fibers also degrade and leach carcinogens when in temperatures over 65 degrees and the human body is an average of 98 degrees, 33 degrees hotter than when degradation begins. Studies

related to PET fiber degradation and leaching became increasingly available post-market, yet the Bayer Defendants never warned about it or reconsidered safer alternative materials. Importantly, the PET fibers are not designed or manufactured for use in human implantation. Moreover, the PET fibers are made of the same materials as the PVT material in some vaginal meshes, which have a high rate of expulsion. The Essure® inserts also contain nickel, which can cause severe reactions in patients. Like the PET fibers, studies became available post-market that put the Bayer Defendants on notice of the dangers of nickel to implanted women, yet the Bayer Defendants failed to adequately warn about it until it was too late for many women and failed to implement safeguards given this danger.

f.    The Essure® website, print advertising, and patient brochure stated "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures." However, Essure® is not "surgery-free" and can cause women serious, life-altering complications including but not limited to debilitating pain, heavy bleeding necessitating medication and/or additional surgical procedures, allergic reactions (including but not limited to rashes, itching, bloating, swelling, headaches, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications. The Bayer Defendants failed in their post-market obligations to monitor and report these serious adverse events.

g.    The Essure® website, print advertising, and patient brochure stated "Essure® is the most effective permanent birth control available—even more effective than tying your tubes or a vasectomy" or words to that effect. Yet, the Bayer Defendants' SEC Form 10-K filing shows that the Bayer Defendants never did a comparison to a vasectomy or tubal ligation. The Bayer Defendants admitted, "We did not conduct a clinical trial to compare the Essure® procedure to laparoscopic tubal ligation."

h.    The Essure® website claims "[c]orrect placement . . . is performed easily because

of the design of the microinsert" or words to that effect. However, the Bayer Defendants admitted that their own experts in hysteroscopy (as compared to general gynecologists not on the same level as an expert hysteroscopist) failed to place the micro-inserts in one out of seven clinical participants. Moreover, the Bayer Defendants failed to warn of the dangers associated with the hysteroscopic procedure, a necessary part of implantation of the device.

i.   The Essure® physician training manual states "[t]he PET fibers are what caused the tissue growth," and Essure® "works with your body to create a natural barrier against pregnancy" or words to that effect. However, during the PMA meeting with the FDA in 2002, The Bayer Defendants represented that the trauma caused by the expanding coil striking the fallopian tubes is what causes the inflammatory response of the tissue, indicating the dangerous PET fibers are entirely unnecessary.

116.   Doctors and patients, including Plaintiff and her implanting physicians, reasonably relied on these misrepresentations by the Bayer Defendants.

117.   These misrepresentations were also published and disseminated by the Bayer Defendants' sales and training force including Christopher Ford Williams, and Plaintiff and her implanting physicians, reasonably relied on these misrepresentations by Christopher Ford Williams.

118.   Physicians purchased Essure® from the Bayer Defendants and then performed the procedure on patients after becoming certified and trained by the Bayer Defendants. During 2008 alone, Conceptus added over 2,000 new physicians to Essure® training and certified over 2,000 physicians to perform Essure®.

119.   On April 21, 2009, at the first quarter Conceptus earnings call, Conceptus' CEO stated "We train and provide programs in all of the elements that go into a successful experience for the patient including office staff training, equipment selection, and other procedures, room infrastructure, physician counseling skills, reimbursement, and referral network building."

120.   The Bayer Defendants pioneered a sales plan aimed at physicians that placed profits

above patient care. At the 2008 fourth quarter Conceptus earnings call, the Bayer Defendants emphasized physicians would "bank" more from performing an Essure® procedure in the office, rather than tubal ligation in the hospital. The Bayer Defendants noted that some physicians had very high rates of utilization and were either referring patients who request tubal ligation to other doctors or "converting" patients to the Essure® procedure.

121.    The Bayer Defendants advertised, promoted, and marketed on their websites, in print and/or video advertisements, brochures, and fact sheets the following statements about physicians performing the Essure® procedure, while failing to report the actual material facts:

a.    "An Essure® trained doctor inserts spring-like coils, called micro-inserts" and "[p]hysicians must be signed-off to perform Essure® procedure" or words to that effect.  However, the Bayer Defendants and Christopher Ford Williams failed to adequately train Dr. Stacy D. Travis and "signed-off" on implanting physicians who did not have the requisite training.

b.    The "Essure® training program is a comprehensive course designed to provide information and skills necessary to select appropriate patients, perform competent procedures and manage technical issues related to the placement of Essure® micro-inserts for permanent birth control" or words to that effect.  However, The Bayer Defendants and Christopher Ford Williams failed to adequately train Dr. Stacy D. Travis;

c.    "In order to be trained in Essure® you must be a skilled operative hysteroscopist. You will find the procedure easier to learn if you are already proficient in operative hysteroscopy and management of the awake patient. If your skills are minimal or out of date, you should attend a hysteroscopy course before learning Essure®" or words to that effect.  However, the Bayer Defendants "signed off" on physicians who were not skilled operative hysteroscopists in order to monopolize and capture the market, including the implanting physicians, and often utilized sales representatives to "train" physicians. Including using Christopher Ford Williams to

"train" (improperly) Dr. Stacy D. Travis;

d.    "In order to be identified as a qualified Essure® physician, a minimum of one Essure® procedure must be performed every 6-8 weeks" or words to that effect. However, the Bayer Defendants "signed off" on "Essure® physicians" who did not perform the procedure every 6-8 weeks.

122.    Doctors and patients, including Plaintiff and Dr. Stacy D. Travis, reasonably relied on these omissions and/or misrepresentations by the Bayer Defendants Christopher Ford Williams.

123.    In its CPMA, the FDA explicitly declined to approve any warranties made by The Bayer Defendants, such as those set forth herein, stating: "CDHR does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable federal and state laws."

124.    The Bayer Defendants' and Christopher Ford Williams' conduct not only violated its federal regulatory duties and its duties under state law, including North Carolina law, but also failed to provide information that was necessary for the medical and scientific community to protect each patient's interest. Because the Bayer Defendants failed to timely, completely, or accurately report their knowledge of the risks and complications associated with the Essure® device, the public's knowledge of the risks associated with the Essure® device were seriously hampered and delayed. This delay of information endangered patient safety, including Plaintiff' safety.

125.    Only after the FDA forced the Bayer Defendants to disclose the withheld information did the medical community become aware of this information, including data concerning the frequency, severity, and permanence of complications associated with the prescription and implementation of the Essure® device.

126.    This belated, untimely release of relevant information led to an increasing number of adverse events being reported to the FDA about Essure® from patients and physicians.

127.    Until late 2013, women adversely affected by Essure® had no convenient method of

reporting their problems directly to the FDA, and thus they reported their problems to Conceptus or Bayer. The FDA learned of an overwhelming number of Essure® adverse events only after women were no longer forced to report their problems directly to Conceptus or Bayer.

128.    Between Essure®'s inception in 2002 until 2015, the FDA received approximately 9,900 medical device reports (MDRs) related to safety problems with the device. Of those 9,900 MDRs, 8,950 reports were received between October 26, 2013 and December 31, 2015.

129.    Changes in available reporting mechanisms directly caused the explosion of adverse event reports that became public after October of 2013.

130.    In response to continued public complaints, on September 24 and 25, 2015, the FDA convened a public hearing concerning the safety and efficacy of the Essure® device. At that public hearing, the Bayer Defendants continued to misrepresent the safety and efficacy of Essure®:

   a.    The Bayer Defendants testified that the efficacy rates for Essure® are 99.6%. In reality, studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations and higher than the rates reported by Bayer to the FDA at the public hearing.

   b.    The Bayer Defendants testified that skin patch testing is not a reliable predictor of clinically significant reactions to nickel-containing implantable devices, including Essure®. Despite this, Bayer told physicians and patients that a nickel sensitivity test was sufficient to determine whether a patient was a suitable candidate for an Essure® device.

   c.    The Bayer Defendants testified that Essure® was an alternative to laparoscopic tubal ligation and that Essure® is a safe and effective method of permanent birth control. In reality, studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations, and Essure® patients are much more likely to require additional surgeries to correct complications associated with the sterilization procedure.

   d.    The Bayer Defendants testified that most of the reports of adverse events to the

FDA have come from consumers and not The Bayer Defendants, which is unusual. In reality, The Bayer Defendants failed to report thousands of the complaints of adverse events that it had received.

131.    The Bayer Defendants' and Christopher Ford Williams' conduct violated the Essure® CPMA, parallel state laws regarding post-marketing conduct, and the FDA post-marketing regulations, which ultimately prevented Plaintiff, physicians, and the public from understanding the true nature of Essure®'s adverse events, risks, and ineffectiveness.

## VIII. FDA REQUIRES BLACK BOX WARNING FOR ESSURE®

132.    On February 29, 2016, the FDA announced "actions to provide important information about the risks of using Essure® and to help women and their doctors be better informed of the potential complications associated with" the device. The FDA took the following actions:

a.      The FDA is requiring a black box warning on Essure® to warn doctors and patients of "reported adverse events, including perforation of the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions." The FDA draft guidance black box warning for Essure® also warns: "Some of these reported events resulted in device removal that required abdominal surgery. This information should be shared with patients considering sterilization with the Essure® device during discussion of the benefits and risks of the device."

b.      The FDA is requiring the Bayer Defendants to implement a Patient Decision Checklist "to help to ensure women receive and understand information regarding the benefits and risks" of Essure®. The FDA's draft Patient Decision Checklist is a five-page document that the physician will discuss with each patient interested in using the device. The patient must initial after each topic of discussion, and both the physician and patient must sign the document. The topics for discussion include, *inter alia*, the risks for "adverse events including persistent pain, device puncture

of the uterus and/or fallopian tubes ('perforation'), or movement of the device into the abdomen or pelvis ('intra-peritoneal migration')"; "allergy or hypersensitivity reactions"; symptoms such as changes in skin (rash, itching), "chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting"; "joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes"; the fact that "there is no reliable test to predict ahead of time who may develop a reaction to the device"; the possibility that the Essure® device "can move after placement," possibly becoming ineffective at preventing pregnancy or leading to "serious adverse events such as bleeding or bowel damage, which may require surgery to address"; and the fact that if the Essure® device has to be removed after placement, it will require surgery to remove and possibly a hysterectomy.

c.     The FDA has also ordered Bayer "to conduct a new postmarket surveillance study designed to provide important information about the risks of the device in a real world environment." The study must provide data on "the risks associated with Essure® and compare them to laparoscopic tubal ligation. This includes the rates of complications including unplanned pregnancy, pelvic pain and other symptoms, and surgery to remove the Essure® device. The study will also evaluate how much these complications affect a patient's quality of life. . . . The FDA will use the results of this study to determine what, if any, further actions related to Essure® are needed to protect public health."

133.    Unfortunately, this new warning, labeling, and patient decision checklist came too late to warn Plaintiff of the true risks of Essure®. Had the Bayer Defendants complied with their federal regulatory duties and their duties under North Carolina law by warning about and reporting the known risks and complications in a timely fashion, the Plaintiff and her physicians would have had this relevant, critical information available to them before the implantation of the Essure® device.

134.    In addition, Congress is calling for the removal of Essure® from the market. Pennsylvania Congressman Mike Fitzpatrick introduced a bipartisan bill entitled the "E-Free Act" on November 4, 2015 to ban sales of the Essure® device.

135.    Congressman Fitzpatrick demanded that Bayer immediately end production of a product that poses such a danger to patient safety. This bill has been renamed "Ariel Grace's Law."

136.    If an unintended pregnancy occurs due to a failure of the Essure® inserts, the inserts present a risk of fetal death, either through ectopic pregnancy or through premature rupture of membranes ("PROM"). PROM may lead to respiratory distress syndrome, infections/sepsis, placental abruption, and fetal death.

137.    A consulting firm specializing in medical device post-marketing surveillance, Device Events, recently analyzed data provided to the FDA for the Congressman. The analysis uncovered raw data showing a total of 303 fetal deaths among women who had the Essure® device and revealed discrepancies in the Bayer Defendants' reporting practices. Previously, the agency had believed that there were only five such cases.

138.    The analysis showed that the manufacturers' reports were falsely marked as mere injury or malfunction reports. However, they described instances of miscarriage, abortion or fetal death, and should have been categorized as "death" reports.

139.    Congressman Fitzpatrick subsequently wrote directly to the Center for Devices and Radiological Health at the FDA and urged them to immediately consider the data due to its grave nature.

140.    At all relevant times, the Bayer Defendants' Essure® product was prescribed and used as intended by the Bayer Defendants and in a manner reasonably foreseeable to the Bayer Defendants.